UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| STEADFAST INSURANCE COMPANY and ZURICH AMERICAN INSURANCE COMPANY,<br><br>Plaintiffs,<br><br>v.<br><br>BANCO SANTANDER, S.A., SANTANDER BANCORP, BANCO SANTANDER PUERTO RICO, SANTANDER SECURITIES LLC, SANTANDER ASSET MANAGEMENT, LLC, SANTANDER HOLDINGS USA, INC.,<br><br>Defendants. | CASE NO. 20-1665 |

## COMPLAINT

TO THE HONORABLE COURT

COME NOW Plaintiffs Steadfast Insurance Company ("Steadfast") and Zurich American Insurance Company ("Zurich American") (Steadfast and Zurich American are collectively referred to as "Zurich"), by and through its undersigned attorneys, allege as follows:

## NATURE OF ACTION

1.  This is an insurance coverage action to adjudicate the rights, duties, and obligations of the parties under various insurance policies issued by Zurich to defendant Santander Bancorp and its affiliated entities with respect to a series of underlying lawsuits and proceedings arising out of the underwriting and sale by Santander of closed-end mutual funds and government bonds issued by Puerto Rico.

2.  Beginning in approximately December 2013, Santander was named in at least 750 Financial Industry Regulatory Authority ("FINRA") arbitrations, two class-action lawsuits, and a

FINRA regulatory matter that resulted in an Assignment, Waiver and Consent ("AWC"). Defendants submitted these matters for coverage to Zurich under one or more insurance policies issued by Zurich.

3. While these matters were filed over a period of years, Zurich determined that all of the matters involved the same Wrongful Acts and/or Interrelated Wrongful Acts, as defined in the applicable insurance policy issued by Zurich, and were thus a single Claim and single Loss subject to coverage under the policy in effect at the time the first Claim was made against one of the defendants in 2013. Zurich has paid the full limit of liability under that applicable policy, $15 million, in connection with the defense of certain of the matters submitted for coverage.

4. Not satisfied, defendants disputed Zurich's coverage position and sought coverage under multiple policies issued by Zurich to defendants in subsequent years, despite the fact that all of the matters submitted involved the same Wrongful Acts and/or Interrelated Wrongful Acts under the clear language of the applicable policy and the subsequent insurance policies thus provided no coverage for these matters.

5. Zurich now seeks a declaration from this Court that all of the FINRA arbitrations, the class action lawsuits and the AWC are a single Claim and single Loss subject to a single limit of liability and that Zurich has satisfied its obligations to defendants by paying the full $15 million limit of liability under the policy in effect at the time that the Claim was first made.

**PARTIES**

6. Plaintiff Steadfast is an Illinois corporation with its principal place of business in Schaumburg, Illinois.

7. Plaintiff Zurich American is a New York corporation with its principal place of business in Schaumburg, Illinois.

8. Upon information and belief, defendant Banco Santander, S.A. ("BSSA") is a global financial services company organized under the laws of the Kingdom of Spain with its principal place of business in Madrid, Spain.

9. Upon information and belief, defendant Santander BanCorp ("BanCorp") was at all relevant times a wholly-owned subsidiary of BSSA and incorporated under the laws of the Commonwealth of Puerto Rico and has its principal place of business in Guaynabo, Puerto Rico.

10. Upon information and belief, defendant Banco Santander Puerto Rico ("BSPR") is a wholly-owned subsidiary of BanCorp and an indirect subsidiary of BSSA and is a Puerto Rico chartered commercial bank with its principal offices in Hato Rey, Puerto Rico.

11. Upon information and belief, defendant Santander Securities LLC ("SSLLC") is a wholly-owned subsidiary of BanCorp and an indirect subsidiary of BSSA and is organized as a limited liability company under the laws of the Commonwealth of Puerto Rico and has its principal place of business in San Juan, Puerto Rico.

12. Upon information and belief, defendant Santander Asset Management, LLC ("SAM") is a wholly-owned subsidiary of SAM Investment Holdings Limited. Upon information and belief, BSSA indirectly owns 50% of SAM Investment Holdings Limited. Upon information and belief, SAM Investment Holdings Limited is a corporation organized under the laws of Jersey, a British Crown Dependency, with its principal place of business in Boadilla del

Monte, Spain. Upon information and belief, SAM is a limited liability company under the laws of the Commonwealth of Puerto Rico and has its principal offices in Guaynabo, Puerto Rico.

13. Upon information and belief, defendant Santander Holdings USA, Inc. ("SHUSA") is a wholly owned subsidiary of BSSA and is a corporation organized under the laws of the Commonwealth of Virginia and has a principal place of business in Boston, Massachusetts.

14. BSSA, BanCorp, BSPR, SSLLC, SAM and SHUSA are collectively referred to as the "Santander Defendants."

## JURISDICTION AND VENUE

15. This Court has original jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a)(1), in that the dispute is between citizens of different states. Steadfast is incorporated and has its principal place of business in Illinois. Zurich is incorporated in New York and has its principal place of business in Illinois. BSSA is incorporated and has its principal place of business in Spain. BanCorp is incorporated and has its principal place of business in Puerto Rico. BSPR is organized and has its principal place of business in Puerto Rico. SSLLC is organized and has its principal place of business in Puerto Rico, and the sole member of SSLLC is BanCorp, which is a citizen of Puerto Rico for jurisdictional purposes. SAM is a limited liability company organized and having its principal place of business in Puerto Rico, and the sole member of SAM is SAM Investment Holdings Limited, which is organized under the laws of Jersey, a British Crown Dependency, with a principal place of business in Boadilla del Monte, Spain. SHUSA is incorporated in Virginia and has a principal place of Massachusetts. There is thus complete diversity of citizenship between Plaintiffs and Defendants.

16. The amount in controversy exceeds $75,000 exclusive of interest and costs.

17.     Venue is proper in this district, either pursuant to 28 U.S.C. § 1391(b)(1) because defendants BanCorp, BSPR, SSLLC and SAM reside in this District or 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred here.

## FACTUAL ALLEGATIONS

**A.     The Underlying Matters**

   **1.     The FINRA Arbitrations**

18.     On or about December 10, 2013, claimant Jose Perez filed a FINRA arbitration against Santander Securities and other entities unrelated to the Santander Defendants entitled *Jose D. Aponte Perez v. Santander Securities LLC, et al.*, FINRA Case No. 13-03579 (the "Perez Action"). The Perez Action alleged that respondents, including SSLLC, over-concentrated his investment funds in unsuitable Puerto Rico municipal bonds and proprietary closed-end funds ("CEF"s) while misrepresenting the true nature of the risk involved, which ultimately resulted in significant losses.

19.     Following the filing of the Perez Action, approximately 750 additional FINRA arbitrations (collectively with the Perez Action the "FINRA Arbitrations") were filed against SSLLC by residents of Puerto Rico who allege that they incurred losses due to the over-concentration in and unsuitability of investments marketed and sold by SSLLC.

20.     Generally, the claimants in the FINRA Arbitrations consist of retired residents of Puerto Rico, groups of family members, and family-owned businesses, who allegedly sought to invest in low-risk conservative investments that would provide a modest income. Claimants alleged that financial advisors at SSLLC (and other respondents) marketed and sold them investments in Puerto Rico government bonds and SSLLC's proprietary "First Puerto Rico" CEFs. Many of the statements of claim asserted that the bonds and funds were marketed as

5

"guaranteed" by the Puerto Rico or U.S. government. Many claimants also contended that they were encouraged to invest their entire portfolio in the subject securities and to take out margin loans on their holdings, which allegedly further increased the risk and impact of their loss.

21. Claimants further alleged that they were not fully apprised of the illiquidity of the CEFs. Because the First Puerto Rico CEFs could only be sold to residents of Puerto Rico, the market for these securities was limited and volatile. The secondary market for claimants' shares relied exclusively on local residents located by SSLLC or SSLLC itself when it wished to buy back shares for its own inventory. Adding to the illiquidity, the CEFs were only traded on a single day each week.

22. Claimants in the FINRA Arbitrations contended that the worrisome economic situation in Puerto Rico made it foreseeable that the quality and creditworthiness of Puerto Rico bonds would degrade. According to the claimants, political events, fallout from the Puerto Rico recession and worldwide economic downturn, high unemployment, pervasive crime, the shrinking economy, increasing government debt, and decisions by the Puerto Rico government with respect to its tax code and spending made the Puerto Rico economy unstable and bound to crash. Claimants alleged that SSLLC should have known that the value of Puerto Rico bonds, and in turn, the assets of the CEFs that were highly invested in those bonds, would reduce substantially and eventually drive the price to near zero or "junk" status.

23. In mid-2012, analysts allegedly were beginning to warn of red flags in the Puerto Rico bond market and cautioned investors to limit their portfolio exposure. Eventually, Moody's downgraded Puerto Rico's credit rating in December 2012 and Fitch followed suit in March 2013. In June 2013, Standard & Poor's allegedly named Puerto Rico the worst-performing state

or territory in the municipal bond market that month. In 2013, Puerto Rico bonds allegedly had their worst year in a decade.

24. With the crash of the Puerto Rico economy, claimants' investments suffered significant losses or were entirely depleted. In some cases, claimants contended that prior to the crash they instructed their financial advisor to reduce their exposure to Puerto Rico government bonds, but that their financial advisor instead ignored or increased their holdings.

25. The FINRA Arbitrations generally contended that the claimants were unsophisticated investors who relied on the experience of their financial advisors at SSLLC, and that SSLLC served in a fiduciary role or operated the claimants' accounts with "de facto practical and functional discretionary control" due to the amount of trust they placed in their financial advisor. SSLLC allegedly failed to diversify claimants' investments in violation of "one of the fundamental and basic tenets of prudent investing."

**2.   The AWC**

26. On or about September 18, 2015, SSLLC signed a Letter of Acceptance, Waiver and Consent with FINRA (the "AWC").

27. The AWC generally involved SSLLC's: (1) failure to have in place reasonably designed supervisory systems and procedures relating to sales of Puerto Rico municipal bonds to Puerto Rican customers; (2) lack of adequate systems and procedures to monitor for the appropriate use of margin in connection with the purchase of the bonds or to monitor for potentially over-concentrated positions in the bonds and Puerto Rico closed-end funds; and (3) failure, during the period of October 2010 through April 2014, to have in place adequate systems and procedures governing transactions in Puerto Rico employee brokerage accounts.

28. According to the AWC, during the period December 2012 through October 2013, SSLLC solicited its Puerto Rico customers to purchase approximately $180 million in Puerto Rico municipal bonds and over $101 million in Puerto Rico CEFs.

29. The AWC concluded that Santander Securities violated the National Association of Securities Dealers ("NASD") Conduct Rules 3010(a) and 3010(b), FINRA Rule 2010, and Municipal Securities Rulemaking Board ("MSRB") Rule G-27 by failing to outline steps for its brokers or supervisors to put systems or procedures in place to ensure that they would assess the impact of concentrated positions in Puerto Rico municipal bonds and Puerto Rico CEFs on its Puerto Rico customers and thereby determine whether new purchases were suitable in light of the existing positions. The AWC also found that SSLLC did not have guidelines for its employees concerning the appropriate use of margin prior to the execution of additional purchases of Puerto Rico municipal bonds.

### 3.     **The Class Actions**

30. On or about September 12, 2016, a putative class-action lawsuit was filed in the Court of First Instance in the Superior Court of San Juan, Puerto Rico entitled *Dionisio Trigo-Gonzalez, et al. v. Banco Santander, S.A., et al.* (the "Trigo-Gonzalez Action").

31. The plaintiffs filed the Trigo-Gonzalez Action purportedly on behalf of a class consisting of all persons who were clients of the named Santander parties and invested in the identified CEFs during the Class Period of March 1, 2012 to the filing of the action and were damaged as a result of the alleged misconduct of the defendants.

32. The Santander parties named in the Trigo-Gonzalez Action allegedly sold the CEFs to retail clients as safe, secure and conservative investments, even though they knew that the majority of the CEFs' investments were in Puerto Rico debt in the form of some of the riskiest government-backed securities. It was also alleged that the defendants knew that contrary

to their investment objective to preserve shareholder capital, the CEFs engaged in a speculative, highly-leveraged investment program that magnified the risk of loss of capital and accelerated investor losses.

33. The Trigo-Gonzalez Action also alleged that although the CEFs were marketed as being designed primarily and were suitable for long-term investors in Puerto Rico, the defendants allegedly did not comply with their contractual and fiduciary obligations to ensure that the CEFs were safe and suitable investments. Instead, the defendants loaded the CEFs with the high-risk bonds they underwrote and improperly concentrated the CEFs' assets in bonds of a single issuer rather than diversifying across debt and equity instruments. The defendants also allegedly solicited clients to invest in risky CEFs without regard to their individual circumstances or risk tolerance.

34. In support of its allegations and claims, the plaintiffs in the Trigo-Gonzalez Action specifically referenced the admissions made by SSLLC in the AWC.

35. On or about October 12, 2017, a putative class-action lawsuit was filed in the United States District Court for the District of Puerto Rico entitled *Jorge Ponsa-Rabell and Carina Perez-Cisneros Armenteros v. Santander Securities, L.L.C.* (the "Ponsa-Rabell Action").

36. The Ponsa-Rabell Action was purportedly filed on behalf of a class consisting of all persons who purchased $180 million worth of Puerto Rico Mutual Bonds and $101 million worth of Puerto Rico Closed End Funds during the Class Period of December 2012 through October 2013.

37. The Ponsa-Rabell Action generally alleged that the defendants breached fiduciary and contractual duties by investing the plaintiffs in high risk Puerto Rico government bonds directly and through CEFs while misrepresenting the true nature of the risks involved, including

9

allegations that the defendants devised a scheme to defraud investors by either: (i) instructing its financial advisors to omit material facts to the plaintiffs and putative class members; or (ii) concealing material facts from its financial advisors to prevent their disclosure to the plaintiffs and putative class members.

38. The FINRA Arbitrations, AWC, Trigo-Gonzalez Action and Ponsa-Rabell Action are collectively referred to herein as the "FINRA Matters."

**B.     The Insurance Policies**

39. Steadfast issued to BanCorp and its Subsidiaries a Bankers Professional Liability Policy bearing policy number IPR 4359124-05 (the "2013-2014 BanCorp Policy") effective for the period July 1, 2013 to July 1, 2014 (the "2013-2014 Policy Period"). The 2013-2014 BanCorp Policy provides a $15 million aggregate Limit of Liability, inclusive of any Defense Costs, subject to a retention of $500,000 each "Loss."

40. The 2013-2014 BanCorp Policy was renewed by Steadfast for the Policy Periods: July 1, 2014 to July 1, 2015; July 1, 2015 to July 1, 2016; July 1, 2016 to July 1, 2017; and July 1, 2017 to July 1, 2018.  The renewals of the 2013-2014 Policy for these subsequent Policy Periods are collectively referred to as the "BanCorp Renewal Policies."

41. Zurich American issued to SHUSA a Bankers Professional Liability Policy bearing policy number IPR 4359114-07 effective for the 2016-2017 Policy Period (the "SHUSA Policy").  The SHUSA Policy provides a $25 million aggregate Limit of Liability, inclusive of Defense Costs, and sublimits of $1 million for each and every "Claim" made against SSLLC for a "Wrongful Act" in connection with the rendering of or failure to render "Broker Services", and $15 million for all "Loss" on account of all "Claims" made against SSLLC.  The SUHSA Policy is subject to a retention of $5 million for each "Loss" as a result of any "Claim" first made

against an "Insured" other than SSLLC or Santander Investment Securities Inc., NY ("SIS") and a retention of $500,000 each "Loss" as a result of any "Claim" first made against SSLLC or SIS.

42. Zurich American issued to Banco Santander, S.A., New York Branch ("Banco NY") a Bankers Professional Liability Policy bearing policy number IPR 4359112-07 effective for the Policy Period (the "Banco NY Policy"). The Banco NY Policy provides a $2 million aggregate Limit of Liability, inclusive of Defense Costs, subject to a $100,000 retention for each "Loss."

43. The 2013-2014 BanCorp Policy, the BanCorp Renewal Policies, the SHUSA Policy and the Banco NY Policy are collectively referred to as the "Zurich Policies."

C. **Santander's Submission of the FINRA Matters and the Coverage Dispute**

44. The Santander Defendants submitted the FINRA Arbitrations, the AWC and the Trigo-Gonzalez Action to Zurich for coverage under one or more of the Zurich Policies.

45. Zurich advised the Santander Defendants that Zurich reserved its rights with respect to the FINRA Arbitrations, the AWC and the Trigo-Gonzalez Action.

46. On March 3, 2016, Zurich advised the Santander Defendants that no coverage was available for the AWC.

47. On May 3, 2017, Zurich advised the Santander Defendants that all of the FINRA Arbitrations, AWC and Trigo-Gonzalez Action involved the same Wrongful Acts and/or Interrelated Wrongful Acts and were thus a single Loss and Claim first made during the Policy Period of the 2013-2014 BanCorp Policy.

48. On November 30, 2017, the Santander Defendants provided notice to Zurich of the Ponsa-Rabell Action and sought coverage under the BanCorp Renewal Policy in effect for the Policy Period of July 1, 2017 to July 1, 2018.

49. On April 18, 2018, Zurich advised the Santander Defendants that the Ponsa-Rabell Action was part of the single Claim consisting of the FINRA Arbitrations, AWC and Trigo-Gonzalez Action and first made during the Policy Period of the 2013-2014 BanCorp Policy and that no coverage was available for that case under the 2017-2018 BanCorp Renewal Policy.

50. Beginning in October 2017, Steadfast paid under the 2013-2014 BanCorp Policy Defense Costs incurred by the Santander Defendants in connection with the FINRA Arbitrations in excess of the $500,000 Retention. In total, Steadfast paid $15 million in Defense Costs and exhausted the full Limit of Liability applicable to the single Claim and single Loss consisting of the FINRA Arbitrations, AWC, Trigo-Gonzalez Action and Ponsa-Rabell Action.

51. On February 18, 2020, Zurich advised the Santander Defendants that the full $15 million limit of liability under the 2013-2014 BanCorp Policy had been exhausted by payment of Defense Costs, and that Zurich would not be paying or advancing any additional amounts in connection with any of the FINRA Matters, and that Zurich would not provide coverage under any of the other Zurich Policies in connection with the FINRA Matters.

52. The Santander Defendants have disputed Zurich's coverage position and have taken the position that the FINRA Matters are covered and Zurich has an obligation to pay Loss for the FINRA Matters under certain of the Zurich Policies other than the 2013-2014 BanCorp Policy.

53. An actual and justiciable case or controversy exists between the parties regarding the rights and obligations of the parties under the Zurich Policies with respect to the FINRA Matters.

4835-3788-2578.3

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

54. Zurich repeats and realleges paragraphs 1 through 53 as if fully set forth herein.

55. The Insuring Clause of the 2013-2014 BanCorp Policy provides:

> The Company Shall pay "Loss" on behalf of the "Insured" that the "Insured" becomes legally obligated to pay as a result of any 'Claim' first made against the "Insured" during the "Policy Period," or, if purchased, during the Extended Reporting Period, for a "Wrongful Act" of an "Insured" or of any person for whose "Wrongful Act" the "Insured" is legally responsible, but only if such "Wrongful Act" occurs: (1) prior to or during the "Policy Period," and (2) solely in the rendering of or failure to render "Professional Services" to others.

56. The 2013-2014 BanCorp Policy defines the term "Claim" to include "a judicial proceeding in a court or an administrative proceeding in which money damages are sought" and "an arbitration proceeding … in which money damages are sought."

57. The 2013-2014 BanCorp Policy defines the term "Wrongful Act" as follows:

> "Wrongful Act" means any act, error or omission actually or allegedly committed or attempted solely in the rendering of or failure to render "Professional Services" to a client of the "Named Insured" or a "Subsidiary," and includes "Interrelated Wrongful Acts."

58. The 2013-2014 BanCorp Policy defines the term "Interrelated Wrongful Acts" as follows:

> all "Wrongful Acts" that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes. All "Wrongful Acts" that are asserted in any single "Claim" shall be considered "Interrelated Wrongful Acts." All "Claims" that allege "Wrongful Acts" that are the same as, related to, arise out of, or are in any way connected to "Wrongful Acts" alleged or contained in any other "Claim" shall also be considered "Interrelated Wrongful Acts."

59. Section V.A of the 2013-2014 BanCorp Policy provides as follows:

> For the purposes of this policy, all "Loss" arising out of the same "Wrongful Act" and all "Interrelated Wrongful Acts" of any "Insured" shall be deemed one "Loss," and such "Loss" shall be deemed to have originated in the earliest "Policy Period" in which a "Claim" is first made against any "Insured" alleging any such "Wrongful Act" or "Interrelated Wrongful Acts."
>
> The Company's maximum liability for all "Loss" on account of all "Claims" first made during the "Policy Period" shall be the Limit of Liability for each "Policy Period" set forth in Item 2. of the Declarations.
>
> The Company's liability hereunder shall apply only to that part of each "Loss" that is excess of the Retention set forth in Item 4. of the Declarations. The Retention shall be borne by the "Insured" and remain uninsured and at its own risk. "Defense Costs" are subject to the Retention.

60. The Single Claim Aggregate Limit Endorsement (the "Single Claim Endorsement") attached to and made part of the 2013-2014 BanCorp Policy and the other Zurich Policies provides as follows:

> If a "Single Claim" is covered in whole or in part under more than one policy of the "Santander Program":
>
> A. the maximum liability for such "Single Claim" shall be the "Single Claim Aggregate Limit of Liability"; and
> B. the applicable Retention under each such policy shall be applied with respect to coverage for such "Single Claim" under such policy.
>
> This Endorsement creates a sublimit which further limits and does not increase the maximum liability of "Zurich" under the "Santander Program".

61. The Single Claim Endorsement defines the term "Single Claim" as follows:

> "Single Claim" means all losses or claims resulting from or arising from:
>
> 1. the same originating cause, event or occurrence;
> 2. the same or essentially the same act, error, omission, negligence, breach of duty or dispute; or

14

       3.     any acts, errors, omissions, negligence, breaches of duty or disputes that have as a common nexus any fact, circumstance, situation, event, transaction or cause or series of causally connected facts, circumstances, situations, events, transactions or causes;

    irrespective of the number of individual claims that may contribute to such losses or claims and also irrespective of whether the losses or claims involve the same or different claimants, insureds or legal causes of action;

62. The "Single Claim Aggregate Limit of Liability" is defined to mean "the amount of the largest aggregate limit of liability of any one applicable primary and excess Policy(ies) of the 'Santander Program' for any single 'Insured.'"

63. The FINRA Arbitrations, AWC, Trigo-Gonzalez Action and Ponsa-Rabell Action allege the same Wrongful Acts and/or Interrelated Wrongful Acts and all Loss arising out of the FINRA Arbitrations, AWC, Trigo-Gonzalez Action and Ponsa-Rabell Action constitute one Loss under the 2013-2014 BanCorp Policy.

64. Moreover, the FINRA Arbitrations, AWC, Trigo-Gonzalez Action and Ponsa-Rabell Action are a single Claim as defined in the Zurich Policies and that the single Claim is subject to the limit of liability under the 2013-2014 BanCorp Policy.

65. Based on the foregoing, Zurich is entitled to a declaration that by paying the $15 million limit of liability of the 2013-2014 BanCorp Policy, Zurich has satisfied all of its obligations to the Santander Defendants in connection with the FINRA Arbitrations, AWC, Trigo-Gonzalez Action and Ponsa-Rabell Action and Zurich has no obligation to pay any further amounts in connection with those matters or provide any coverage for those matters under any of the Zurich Policies.

**WHEREFORE**, Zurich demands judgment as follows:

a.  On the First Cause of Action, for a judgment declaring that by paying the $15 million limit of liability of the 2013-2014 BanCorp Policy, Zurich has satisfied all of its obligations to the Santander Defendants in connection with the FINRA Arbitrations, AWC, Trigo-Gonzalez Action and Ponsa-Rabell Action and Zurich has no obligation to pay any further amounts in connection with those matters or provide any coverage for those matters under any of the Zurich Policies; and

b.  For costs and attorneys' fees; and

c.  For such other and further relief as the Court deems just and proper.

In San Juan, Puerto Rico, this 23rd day of November, 2020.

> Respectfully submitted,
>
> S/ FRANCISCO E. COLÓN-RAMÍREZ
> **FRANCISCO E. COLÓN-RAMÍREZ**
> USDC PR Bar No.: 210510
> fecolon@colonramirez.com
> **COLÓN RAMIREZ LLC**
> Street: 1225 Ponce de León Ave.
> VIG Tower Suite 1503
> San Juan, PR 00907
> Postal: PO Box 361920
> San Juan, PR 00936-1920
> Tel. 1 888-760-1077
> Fax 1 305-507-1920
>
> and

        ROPERS MAJESKI PC
Andrew L. Margulis (pro hac vice forthcoming)
Amber W. Locklear (pro hac vice forthcoming)
750 Third Avenue, 25th Floor
New York, NY 10017
Phone:  212-668-5927
Fax:     212-668-5929
andrew.margulis@ropers.com
amber.locklear@ropers.com


*Attorneys for Plaintiffs*
*STEADFAST INSURANCE COMPANY and*
*ZURICH AMERICAN INSURANCE COMPANY*

17